Elouise Pepion **COBELL,**
et al., Plaintiffs,

v.

Gale A. **NORTON,** Secretary of the Interior, et al., Defendants.

No. CIV.A. 96–1285(RCL).

United States District Court,
District of Columbia.

Jan. 17, 2003.

See also 226 F.Supp.2d 163.

## MEMORANDUM AND ORDER

LAMBERTH, District Judge.

This matter comes before the Court on thirteen separate motions to disqualify the presiding judge, Special Master Alan Balaran ("Master"), and Special Master–Monitor Joseph S. Kieffer, III ("Monitor") from participating in proceedings against 39 individuals, present or former employees of the United States government whose employment required them to participate in activities related to the individual Indian trust accounts at issue in the present action.[1] In the alternative, mov-

---

1. Anne Shields' Motion for Recusal, or in the Alternative, to Take Discovery Relating to Ex Parte Communications [1581–1, 1581–2], filed on October 29, 2002; Philip A. Brooks' Motion for Recusal, or in the Alternative, to Take Discovery Relating to Ex Parte Communications [1582–1, 1582–2], filed on October 29, 2002; Motion for Recusal (Bruce Babbitt, John Leshy, Edward Cohen, and Edith Blackwell) [1583–1], filed on October 29, 2002 ["Babbitt Motion"]; Charles W. Findlay's Mo-
tion for Recusal, or in the Alternative, to Take Discovery Relating to Ex Parte Communications [1645–1], filed on November 6, 2002; Michael Rossetti's Motion for Recusal or, in the Alternative, to Take Discovery Regarding Ex Parte Communications [1595–1], filed on November 6, 2002; John S. Most's Motion for Recusal of Royce C. Lamberth or in the Alternative, to Take Discovery Relating to Ex Parte Communications [1601–1], filed on November 8, 2002; Motion for Recusal, or in the Alter-

ants seek to take full discovery relating to alleged ex parte communications among the Master, the Monitor, other government employees, and the Court.[2] Because the motions and supporting memoranda are nearly identical in their factual statements and arguments, the Court will ad-

dress all thirteen in this opinion.[3] Upon consideration of the Recusal Motions, plaintiffs' consolidated opposition brief, movants' reply briefs, the applicable law in this case, and the entire record herein, the Court finds the Recusal Motions to be without merit.[4]

native, to Take Discovery Related to Ex Parte Communications (Michael Carr) [1646–1], filed on November 15, 2002; Tom Clark II's Motion for Limited Recusal [1665–1], filed on December 10, 2002; David Shuey's Motion for Recusal, or in the Alternative, For Leave to Take Discovery to Ex Parte Communications [1672–1], filed on December 11, 2002; Motion of Sarah Himmelhoch for Recusal, or, in the Alternative, for Discovery Relating to Ex Parte Communications [1675–1], filed on December 16, 2002; Motion of Kenneth F. Rossman for Recusal, or, in the Alternative, for Discovery Relating to Ex Parte Communications [1679–1], filed on December 18, 2002; Motion for Recusal and Disqualification or, in the Alternative, to Take Discovery Regarding Ex Parte Communications (Sabrina McCarthy) [1683–1], filed on December 20, 2002; and Steven Swanson's Motion for Recusal and Disqualification or, in the Alternative, to Take Discovery Regarding Ex Parte Communications [1689–1], filed on December 26, 2002 ["the Recusal Motions"].

2. For the purposes of this Opinion, "ex parte communications" will refer to communications related to matters in dispute between a judge or a judicial agent (magistrate, special master, receiver, expert) and other persons— parties, non-parties, witnesses, etc.—without counsel for the parties present. In ordinary parlance, an ex parte communication is a "generally prohibited communication[] between counsel and the court when opposing counsel is not present." BLACK'S LAW DICTIONARY 597 (7th ed.1999); cf. RICHARD E. FLAMM, JUDICIAL DISQUALIFICATION § 14.3.1, at 410 (1996) ("[A]n ex parte contact is generally thought to be one between a person who is in a decision-making role and a person who is either a party or counsel to a proceeding before him that takes place without notice and outside the record.").

3. In fact, because eleven of the Recusal Motions simply incorporate by reference the allegations set forth in the Babbitt Motion with-

out providing additional substantive claims, the Court will focus its discussion on the Babbitt Motion. Only the Shuey Motion appears to have added additional facts in support of its claims (which are addressed below), though it does not supplement these facts with any additional claims.

4. Movants, significantly, do not seek to disqualify Master Balaran from participating in the underlying litigation. They request only that the Master be disqualified from any further proceedings regarding motions seeking civil and criminal contempt that the Court referred to him on September 17, 2002. See Babbitt Motion at 2 ("[A]bsent recusal of the Court and disqualification of the Special Master and the Court Monitor from further proceedings involving these matters, the Movants will not be afforded these fundamental legal rights."); Shields Motion at 1–2 (seeking recusal "because extensive ex parte communications between the Court and the Special Master–Monitor have given Judge Lamberth 'personal knowledge of disputed evidentiary facts' concerning the substance of the Show Cause Proceedings that have been instituted against her"); Findlay Motion at 2 (seeking "recusal of this Court from the Order to Show Cause Proceedings against him, in his individual capacity"); Brooks Motion at 2 ("Because the Court has had extensive ex parte communications with Mr. Kieffer ... the Court has gained 'personal knowledge' of disputed evidentiary facts concerning the proceeding," and recusal is warranted); Most Motion at 1 (requesting that "the Honorable Royce C. Lamberth recuse himself, and order the disqualification of Special Master–Monitor Joseph S. Kieffer III and Special Master Alan L. Balaran, from any and all proceedings regarding movant in his individual capacity"); Rossetti Motion at 1 (seeking "recusal of the Honorable Royce C. Lamberth over matters involving Mr. Rossetti in his individual capacity, including any proceedings preliminary to a Show Cause proceeding or any Show Cause proceedings as

## I. BACKGROUND

On February 22, 1999, this Court found defendants Secretary of the Interior Bruce Babbitt, Secretary of the Treasury Robert Rubin, and Department of the Interior Assistant Secretary, Indian Affairs Kevin Gover to be in civil contempt of the Court's discovery orders of November 27, 1996 and May 4, 1998. Two days later, in accordance with Rule 53 of the Federal Rules of Civil Procedure and with the consent of both parties, this Court appointed Alan Balaran to serve as a special master in this litigation. Special Master Balaran was ordered to "oversee the discovery process in this case to ensure that discovery is conducted in the manner required by the Federal Rules of Civil Procedure." Order dated February 24, 1999, at 2. To fulfill his duties, the Court endowed Special Master Balaran with the authority to "do all acts and take all measures necessary or proper for the efficient performance of the master's duties, as set forth in this order." *Id.*[5] With the consent of the parties, the Court subsequently expanded Mr. Balaran's order of reference to include oversight of "the Interior Department's retention and protection from destruction of IIM Records through, among other things, onsite visits to any location where IIM Records are not being protected from destruction or threatened destruction." Order dated August 12, 1999 at 2. On March 29, 2002, the Court clarified these orders of reference by holding that the Master could engage in *ex parte* communications in the discharge of his obligations. *See* Mem. and Order dated March 29, 2002 at 7–8 (noting that "courts have uniformly acknowledged the authority of institutional reform special masters to uncover facts and collect evidence via *ex parte* contacts with parties and counsel.... [and that] Interior has never objected to any of the Master's reports chronicling those visits and assessing the evidence accumulated therefrom.").

On April 16, 2001, with the consent of both parties, the Court appointed Joseph S. Kieffer, III, to serve as court monitor in this action. Mr. Kieffer was directed to "monitor and review all of the Interior defendants' trust reform activities and file written reports of his findings," which were to include "a summary of the defendants' trust reform progress and any other matter [he] deems pertinent to trust reform." Order dated April 16, 2001 at 2. Defendants were ordered to "facilitate and assist Mr. Kieffer in the execution of his

---

may be directed against him, either through this Honorable Court or through its appointed Special Master, Alan L. Balaran"); Carr Motion at 1 ("Because the Court, Special Master Balaran, and Special Master–Monitor Kieffer have engaged in extensive *ex parte* communications which affect their ability to function as neutral parties in determining whether Mr. Carr moves to recuse them from investigating or adjudicating any contempt proceedings raising from Plaintiffs' motion."); Clark Motion at 1 ("Tom C. Clark II brings this motion for the limited recusal of the Judicial Officers who preside over this case from taking part in any proceedings related to plaintiffs' motion for an order to show cause regarding contempt as to Mr. Clark."); Shuey Motion at 1 (seeking that "the Honorable Royce C. Lamberth recuse himself and order the disqualification of Special Master–Monitor Joseph S. Kieffer III and Special Master Alan L. Balaran, from any and all proceedings regarding movant in his individual capacity.").

5. This language in the Balaran Order of Reference quotes directly the description of the powers granted to special masters appointed pursuant to Rule 53 and can be read to include the judicial gloss applied to those words that further define those powers, including the authority to engage in ex parte communications under certain circumstances. *See, e.g., Alberti v. Klevenhagen,* 660 F.Supp. 605, 610 (S.D.Tex.1987); *Ruiz v. Estelle,* 679 F.2d 1115, 1170 (5th Cir.1982); and *Thompson v. Enomoto,* 815 F.2d 1323, 1326 n. 7 (9th Cir. 1987), discussed *infra.*

duties and responsibilities" and to provide him with "access to any Interior offices or employees to gather information necessary or proper to fulfill his duties." *Id.* The Court explicitly authorized Mr. Kieffer to "make and receive *ex parte* communications with all entities necessary or proper to effectuate his duties." *Id.*

On November 28, 2001, the Court issued an order directing Secretary Norton and Assistant Secretary McCaleb to show cause why they should not be held in contempt (1) for failure "to comply with the Court's Order of December 21, 1999, to initiate a Historical Accounting Project"; (2) for "committing a fraud on the Court by concealing the Department's true actions regarding the Historical Accounting during the period from March 2000 until January 2001"; (3) for "committing a fraud on the Court by failing to disclose the true status of the TAAMS project between September 1999 and December 21, 1999"; and (4) for "committing a fraud on the Court by filing false and misleading quarterly reports starting in March 2000, regarding TAAMS and BIA Data Cleanup." Order dated November 28, 2001 at 2. On December 6, 2002, a fifth specification was added, ordering Secretary Norton and Assistant Secretary for Indian Affairs Neal McCaleb to show cause why they should not be held on contempt for "[c]ommitting a fraud on the Court by making false and misleading representations starting in March 2000, regarding computer security of IIM trust data." Order dated Dec. 6, 2001 at 1.

The first four counts facing the Secretary and the Assistant Secretary were grounded in findings made by the Court Monitor in his reports, dated July 11, 2001 (Interior's statistical sampling project); August 9, 2001 (TAAMS); September 17, 2001 (the BIA Data Cleanup project); and October 16, 2001 (Interior's Seventh Quarterly Report). The fifth contempt count was premised upon the November 14, 2001

Report and Recommendation of the Special Master Regarding the Security of Trust Data at the Department of the Interior.

On September 17, 2002, following a trial, the Court held both Secretary Norton and Assistant Secretary of Indian Affairs Neal McCaleb in contempt of court for "engag[ing] in litigation misconduct by failing to comply with the Court's Order of December 21, 1999, to initiate a Historical Accounting Project.... Committ[ing] a fraud on the Court by concealing the Department's true actions regarding the Historical Accounting Project during the period from March 2000, until January 2001.... Committ[ing] a fraud on the Court by failing to disclose the true status of the TAAMS subproject between September 1999 and December 21, 1999.... Committ[ing] a fraud on the Court by filing false and misleading quarterly status reports starting in March 2000, regarding TAAMS and BIA Data Cleanup.... [and] committ[ing] a fraud on the Court by making false and misleading representations starting in March 2000, regarding computer security of IIM trust data." Order dated Sept. 17, 2002 at 1–2.

On the same date, the Court referred to the Master (1) plaintiffs' Motion for Order to Show Cause Why Interior Defendants and Their Employees and Counsel Should Not Be Held in Contempt for Violating Court Orders and for Defrauding This Court In Connection With Trial One, which had been filed on October 19, 2001, and (2) plaintiffs' Motion for Order to Show Cause Why Interior Alleged Contemnors and Their Counsel Should Not Be Held in Contempt for Destroying E-mail, which had been filed on March 20, 2002 (collectively, the "September 17 Referrals").[6]

In reference to the first motion, the Court directed the Master to "develop a

---

6. *The Babbitt Motion alludes to a third mo-* tion, plaintiffs' Mem. in Support of Mot. for

complete record with respect to these 39 non-party individuals .... [and] upon completing his review of these matters, issue a report and recommendation regarding whether each individual should be ordered to show cause why he or she should not be held in (civil or criminal) contempt of court, or whether other sanctions are appropriate against such individuals." Mem. Op. dated Sept. 17, 2002 at 255. In reference to plaintiffs' March 2002 motion, the Court ordered "that the plaintiffs' motion for order to show cause why Interior defendants and their counsel should not be held in contempt for destroying e-mail ... shall be referred to Special Master Balaran. Special Master Balaran shall issue a report and recommendation on the issues raised in the plaintiffs' motion." Order dated Sept. 17, 2002 at 4. This latter referral stemmed from the Master's report and recommendation wherein he found that "defendant ha[d] ignored its duty to retain and preserve backup tapes of e-mail messages responsive to the Third Formal Request for Production of Documents" and noted that it would be "impossible to assess the impact that defendant's spoliation may have had on Phase I trial issues or what it may have on future proceedings which touch upon defendants' trust obligations...." Op. dated July 27, 2001 at 17, 18.

These referrals prompted movants to file their respective motions for recusal. Those motions articulate movants' concern that the Master and Monitor have engaged in secret, off-the-record communications with employees and officials of the Interior Department as well as with the Court, the substance of which they are not aware. *See, e.g.,* Babbitt Motion at 7 ("Though the substance of the communications cannot be known with certainty, because they were not recorded, the sheer number of contacts and length of the contacts suggest the Court Monitor performed much of his work for this case *ex parte* and in secret."); Shuey Motion at 11 ("Special Master Balaran's invoices detail extensive substantive *ex parte* contacts that Special Master Balaran has engaged in with a wide range of entities and persons."). Movants assert that the Monitor's time records reference a number of meetings with employees and officials from the Interior Department, as well as meetings with the Court, and note that the Monitor's meetings with the Court have been acknowledged by the Court. Movants also point to the invoices of the Master reflecting time expended during meetings with the Court, with Special Trustee Tom Slonaker, with the former Chief Information Officer for the Bureau of Indian Affairs, and with a number of former Interior Department employees.

Beyond demanding the recusal of the Master and Monitor from any and all proceedings concerning the September 17 referrals, movants urge the Court to recuse itself from these proceedings pursuant to 28 U.S.C. §§ 455(a) and (b)(1).[7] Movants argue that although the communications between the Court and its special masters were "not improper in the context of the

---

Order to Show Cause Why Past and Present Interior Defendants and their Employees and Counsel Should Not Be Held in Contempt, which was filed on August 27, 2001. *See* Babbitt Motion at 1 & n. 1. On November 28, 2001, the Court granted that motion as to Interior defendants in their official capacities, but explained that it would defer any ruling on the motion as to non-party employees and counsel. *See* Order to Show Cause, dated Nov. 28, 2001, at 1. Having examined the remaining allegations in the August 27 motion, the Court has determined that they have been merged into and subsumed by plaintiffs' October 19, 2001 motion for an order to show cause. Accordingly, only the October 19, 2001 and March 20, 2002 motions have been referred to the Master.

7. 28 U.S.C. § 455(a) provides that "[a]ny justice, judge, or magistrate judge of the United

underlying litigation," for the purposes of the underlying contempt proceedings, the Master and the Monitor "furnished the Court with extrajudicial knowledge" about the current litigation, mandating the recusal of all three. Babbitt Motion at 18. In the alternative, movants seek to conduct discovery upon the Master and Monitor to ascertain the substance of these communications.

As demonstrated below, movants' attempt to recuse the Master, the Monitor and this Court from officiating in the September 17 referrals on the basis of alleged ex parte communications is without merit. Movants have misconstrued the scope of Court's referral of the contempt allegations to the Master, misapplied the legal standards in this jurisdiction and misstated the facts concerning the nature of the contacts among the Master, Interior employees, the Monitor, and the Court. As further discussed below, the Master and Monitor have conducted their activities and acquitted their responsibilities well within applicable legal and ethical bounds. They have neither received nor used ex parte communications in a manner that would undermine the ability of the Master to investigate the underlying allegations in an unbiased manner or the ability of the Court to render a fair adjudication. In other words, movants have failed to meet their burden for disqualifying the Master, the Monitor, or this Court in conjunction with the contempt allegations raised by plaintiffs.

## II. MOTION TO DISQUALIFY THE SPECIAL MASTER

### A. Standard of Review

 The discretion of this Court in considering the sufficiency of a motion to remove a judicial officer pursuant to 28 U.S.C. § 455(a) is broad. *See James v. District of Columbia,* 191 F.Supp.2d 44, 46–47 (D.D.C.2002). Under federal law, a judge may be disqualified in two situations that are relevant to the instant motions: (1) where his or her "impartiality might reasonably be questioned," 28 U.S.C. § 455(a), and (2) where he or she possesses "a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). Whereas section 455(a) "sets out an objective standard for recusal, creating the so-called 'appearance of justice' rule," *DeLuca v. Long Island Lighting Co.,* 862 F.2d 427, 428 (2d Cir.1988) (citation omitted), section 455(b)(1) has been interpreted to mean any "alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

In confronting a challenge under either provision, the Court must begin its analysis of the allegations supporting such a request with a presumption against disqualification. *See Tripp v. Executive Office of the President,* 104 F.Supp.2d 30, 34 (D.D.C.2000) ("Judges are presumed to be impartial."); *McCann v. Communications Design Corp.,* 775 F.Supp. 1506, 1522 (D.Conn.1991) ("The judge to whom a recusal motion is addressed is presumed to be impartial."). To overcome that presumption, movants must demonstrate by clear and convincing evidence that the

States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(b)(1) provides that a justice, judge or magistrate judge shall disqualify himself where "he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

Master has conducted himself in a manner supporting his disqualification. *See Kinnear–Weed Corp. v. Humble Oil & Refining Co.*, 441 F.2d 631, 634 (5th Cir.1971) (clarifying that a party must produce clear and convincing evidence that a judge should be disqualified pursuant to section 455); *cf. C & W Fish Co. v. Fox*, 931 F.2d 1556, 1564–65 (D.C.Cir.1991) (declaring that an agency administrator should be disqualified from rulemaking on account of prejudice only upon a "clear and convincing showing" of an "unalterably closed mind on matters critical to the disposition of the proceeding").

**B. The Nature of the Court's September 17, 2002 Referral of the Contempt Allegations to the Special Master**

On September 17, 2002, the Court directed the Master to "develop a complete record with respect to these 39 non-party individuals .... [and] upon completing his review of these matters, issue a report and recommendation regarding whether each individual should be ordered to show cause why he or she should not be held in (civil or criminal) contempt of court, or whether other sanctions are appropriate against such individuals." Mem. Op. dated September 17, 2002 at 255. The Court further directed the Master to investigate the destruction of e-mail backup tapes and to file a report and recommendation with the Court. Order dated September 17, 2002 at 4.

In so doing, the Court instructed the Master to review the allegations lodged by plaintiffs in their show cause motions dated October 19, 2001 and March 20, 2002, and to file a report and recommendation after investigating those claims. The Court did not ask the Master to adjudicate any of the issues raised in plaintiffs' contempt motions, and did not bestow on the Master any authority to render any decision as to whether contempt should lie. Rather, the Court directed the Master to assess whether the thirty-nine individuals had violated the Court's orders: (1) to retain trust records in the form of e-mail backup tapes and (2) to report candidly to the Court concerning the progress of trust reform initiatives. This direction was not without precedent: the Court had previously ordered the Master to assess whether the Interior Department was complying with its order to retain and protect IIM Records from destruction. *See* Order dated August 12, 1999 at 2. As discussed below, it is a permissible—indeed, necessary—function of special masters to conduct these types of investigations in order to ensure that defendants follow judicial directives, and it is expected that masters will engage in ex parte contacts in the course of such investigations. The September 17 Referrals to Special Master Balaran are no different.

**C. Analysis**

Movants maintain that Special Master Balaran must be disqualified from performing his investigatory functions pursuant to the September 17 Referrals because he occupies a position "functionally indistinguishable from that of a judge" and, as such, is proscribed from adjudicating matters regarding which he has been privy to information obtained outside the presence of counsel. Although movants' arguments seem compelling at first glance, they are incorrect as a matter of fact and as a matter of law.

**1. An Institutional Master May Engage in Ex Parte Communications in the Discharge of His Obligations**

The original Order of Reference appointing the Master provided that "[t]he

special master has and shall exercise the power to regulate all proceedings in every hearing before the master and *to do all acts and take all measures necessary or proper* for the efficient performance of the master's duties, as set forth in this order." Order dated February 24, 1999 at 2 (emphasis added). On August 12, 1999, the Court signed a consent order drafted by both parties that authorized the Master "to oversee the Interior Department's retention and protection from destruction of IIM Records through, among other things, on-site visits to any location where IIM Records are not being protected from destruction or threatened destruction, he may recommend to the Department that it take reasonable steps to protect IIM Records found to be in jeopardy of destruction. He may also recommend to the Court such remedial action as he deems appropriate pursuant to Rule 53, Federal Rules of Civil Procedure." Order dated August 12, 1999 Order at 2.

While the initial order of reference was designed to appoint a special master for the dual purpose of resolving discovery disputes and ensuring compliance with the Court's discovery orders in this regard,[8] the August 12 Order focused more specifically on "the need for [a] special master[ ] ... in the context of institutional reform litigation, specifically during its remedial states, i.e., efforts to mend constitutional and statutory defects in the structures and practices of [an] institution[ ]." *Special Project, The Remedial Process in Institutional Reform Litigation,* 78 COLUM. L. REV. 784, 788 (1978). It is well established that in such instances, "special masters play an essential role, providing a judicial presence at the institution while freeing the judge to attend to other matters." Note, *Rule 53, Inherent Powers, and In-*

*stitutional Reform,* 66 N.Y.U.L. REV. 800, 820 (1991). *See also Ruiz v. Estelle,* 503 F.Supp. 1265, 1389 (S.D.Tex.1980) ("Supervision and monitoring of the defendants' effectuation of the decree to be entered in this civil action will require the appointment of one or more special masters .... [because] [t]he court does not have the resources necessary effectively to superintend the day-to-day details of the execution of the program to be set out in the decree."), *aff'd in part, rev'd in part,* 679 F.2d 1115 (5th Cir.1982).

Although Rule 53(d)(1) of the Federal Rules of Civil Procedure permits a special master to proceed ex parte only where necessary to provide notice when "a party fails to appear at the time and place appointed," courts have acknowledged the need for special masters serving in cases involving institutional reform to engage in ex parte contacts with both parties and counsel. *See, e.g., Alberti v. Klevenhagen,* 660 F.Supp. 605, 609 (S.D.Tex.1987) (authorizing "communicat[ions] with counsel for the parties from time to time in his discretion (including ex parte) concerning any matters as to which the Fact Finding Special Master deems such communications to be appropriate in understanding the issues and performing his duties as a Master."). In the instant case, defendants contemplated that such off-the-record communications would take place. *See* July 12, 2000 Mem. to Bureau of Indian Affairs Employees from Assistant Secretary for Indian Affairs Kevin Gover ("[P]lease admit Mr. Balaran to all areas within your control that contain IIM records and provide him with all necessary cooperation and courtesy attendant to the exercise of his authority under the Court's orders."); March 2, 2001 Mem. from Deputy Commissioner of Indian Affairs Sharon Black-

---

8. *See* MANUAL FOR COMPLEX LITIGATION § 21.424 (3d ed.1995) (explaining that "[s]pecial masters have been successfully used to oversee discovery").

well (same); *see also* February 23, 2001 Letter from Richard L. Gregg, Commissioner, Financial Management Service and Van Zeck, Commissioner, Bureau of Public Debt to All Federal Reserve Banks and Branches (requesting that "senior Bank or Branch records officer[s] meet with Special Master Balaran and any officials accompanying him and extend to him and those with him every courtesy").

It has also been a long-established practice for special masters to conduct confidential interviews in the course of their capacity of ensuring compliance with the court's decrees. *See Thompson v. Enomoto*, 815 F.2d 1323, 1326 n. 7 (9th Cir.1987) (permitting the special master to "interview, on a confidential basis or otherwise, any person, including any correctional staff member or inmate, affected by the Consent Decree"); *National Org. for Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 539 (9th Cir.1987) (authorizing the special master to "interview, on a confidential basis or otherwise, any CAMP director, supervisor, or team member, or any person assisting in the implementation of the CAMP program"); *Ruiz v. Estelle*, 679 F.2d 1115, 1170 ("The Special Master may conduct confidential interviews and meetings at the institution to which they are confined with any prisoner or group of prisoners under the jurisdiction of the Texas Department of Corrections."), *amended in part, vacated in part*, 688 F.2d 266 (5th Cir.1982); *Reed v. Cleveland Bd. of Educ.*, 607 F.2d 737, 741 (6th Cir. 1979) (granting the special master "free access" to all employees and staff of defendant school boards); *Alberti*, 660 F.Supp. at 610 (authorizing the special master "to conduct unimpeded confidential interviews with any County employee possessing rele-

vant information, any member of the Sheriff's staff or any inmate. They shall have the unrestricted right to tape-record any interview, and shall have the right to attend any institutional meetings or proceedings . . ."); *Young v. Pierce*, 640 F.Supp. 1476, 1489 (E.D.Tex.1986) (noting that the special master had been granted plenary authority to interview employees and staff of defendant federal agency), *vacated on other grounds*, 822 F.2d 1368 (5th Cir. 1987); *Toussaint v. McCarthy*, 597 F.Supp. 1388, 1420 (N.D.Cal.1984) (authorizing the special master to interview confidentially anyone affected by the court's permanent injunction, including correctional staff members and inmates), *aff'd in part, rev'd in part, vacated in part*, 801 F.2d 1080 (9th Cir.1986). Perhaps the most cogent explanation of the need for these off-the-record communications was provided by Chief Judge Posner who, in responding to a challenge of "procedural irregularities, in particular the fact that the master engaged in ex parte communications with the plaintiff's lawyers," explained: "[t]he reason is practical, and is connected once again with the managerial character of institutional reform litigation in the remedial phase. The master is not a judge, and the judicializing of his role would slow him down and thus further protract this litigation, already in its tenth year." *People Who Care v. Rockford Bd. of Educ., School Dist. No. 205*, 171 F.3d 1083, 1088 (7th Cir.1999).[9] In accordance with these prerogatives—and with the Interior Department's explicit acknowledgment of the Master's authority to conduct unsupervised visits to all locations within the control of the Department of the Interior which house trust data—the Master has engaged in numerous ex parte confi-

---

9. It is worth noting that Chief Judge Posner estopped the defendant from objecting to such

ex parte contacts. *Id.*

dential interviews with Interior and Treasury Department employees.

Any concern expressed by movants that the Master's ex parte contacts might affect his ability to fairly adjudicate the issues raised by the September 17 Referrals is therefore nonsensical. Their arguments misconstrue the very nature of the Court's September 17 Referrals, which are manifestly not directives to adjudicate, or to render decisions upon, the ultimate issues involved. Instead, these referrals issued for the same reason that the judges in the above-mentioned cases, recognizing the need to utilize the services of special masters to monitor compliance with their orders, issued similar referrals. The sheer volume of the issues raised by plaintiffs necessitate that plaintiffs file bills of particulars and that a trusted special master be dispatched to report on whether movants have complied with the orders that led to the contempt findings against the Secretary of the Interior and the Assistant Secretary for Indian Affairs, and whether they have violated its orders to preserve and retain individual Indian trust data.

### 2. A Special Master Is Functionally Distinguishable From a Judge in Several Critical Aspects.

■ An assignment to investigate compliance with judicial directives does not automatically vest a special master with the authority of an Article III judge. For although Article III judges may render dispositions on contested substantive issues, the ability to make such determina-

tions lies beyond the authority that may properly be referred to special masters. *See In re Bituminous Coal Operators' Ass'n Inc.*, 949 F.2d 1165, 1169 (D.C.Cir. 1991) ("[I]t is the function of the district judge, in a non-jury civil case, to decide dispositive issues of fact and law genuinely disputed by the parties. The judge may not impose on the parties, over the objection of at least one of them, a magistrate or master as 'a surrogate judge' to try the controversy and determine liability."); *In re United States*, 816 F.2d 1083, 1092 (6th Cir.1987) (finding that the "reference of dispositive motions to the special master will deprive the parties of their right to have the basic issues heard by a district judge").

■ However, in the instant proceedings, the Master has not been asked to decide whether a finding of civil or criminal contempt should lie. Nor has he been directed to resolve any dispute central to the merits of the underlying litigation. Instead, the Master has been charged with (1) investigating whether officials of the Interior Department, and their counsel, violated Court orders and (2) issuing a report and recommendation that sets forth his findings as to whether there is sufficient evidence that would merit further oral or evidentiary hearings on plaintiffs' motions. The Master's ability to make use of ex parte contacts in performing these functions cannot rationally be disputed, given that the use of such contacts has been explicitly recognized by virtually all circuits,[10] by the Federal Judicial Center,[11]

---

10. *See* cases cited *supra* section II.C.1.

11. *See* Willging, Hooper, Leary, Miletich, Reagan & Shapard, *Special Masters' Incidence and Activity: Report to the Judicial Conference's Advisory Committee on Civil Rules and Its Subcommittee on Special Masters* 8 (2000), *available at* http://www.uscourts.gov/rules/newrules10.html:

In general, we found that the nature of the special master appointment determined whether ex parte communication was permitted. For example, judges typically permitted ex parte communication directed toward administrative, procedural, and settlement matters. Whether the appointment occurred at pretrial, trial or posttrial states also played a role in whether a

by the parties[12] and by movants themselves.[13] Given movants' acceptance of the Master's ex parte communications during his investigation of defendants' compliance with the Court's proscription against destroying trust records, their objections to his utilizing such communications in the current proceedings makes little sense. These objections are further undermined by the well-established rule that, to the extent that a special master's report relies upon information obtained from one-sided communications, it cannot be accorded the same level of deference as reports based upon evidence received during a more formalized proceeding. *See, e.g., Mullen,* 828 F.2d at 539 ("[T]he Monitor shall not base any findings or legal conclusions in any subsequent contempt hearing on statements received . . . informally from citizens and witnesses."); *Ruiz,* 679 F.2d at 1162–63 (modifying an order permitting the special master to submit reports based on his own observations and investigations without a formal hearing, to provide that

such reports would not be entitled to a presumption of correctness); *Young v. Pierce,* 640 F.Supp. at 1478 (stating that the "clearly erroneous" standard applied only to findings of the special master that were based on hearings conducted on the record after notice to the parties); *Lelsz v. Kavanagh,* 112 F.R.D. 367, 370 (N.D.Tex. 1986) (same).

The Court has expressly permitted the Special Master to engage in ex parte communications in the course of his various assignments, and there is nothing in the September 17 Referrals that proscribes such contacts in the course of his investigation of the matters referred to him. Additionally, although nothing in the record even suggests that any off-the-record contacts that the Master may have engaged in bore any relationship to the issues germane to the September 17 Referrals, nevertheless, out of an abundance of caution, the Court will not apply a "clearly erroneous" standard to any recommendations

---

judge allowed ex parte communications. For example, posttrial masters appointed to monitor compliance with an order almost always were expressly allowed, even instructed, to communicate ex parte with the parties.

**12.** *See* discussion *supra* section II.C.1. Incidentally, movants have objected that they never consented to the Court's authorization to allow the Master and Monitor to engage in ex parte communications. *See, e.g.,* Babbitt Motion at 5 ("[N]one of the movants was a party to the *Cobell* litigation in any capacity at the time of [the Monitor's] appointment, and they never consented to his appointment and never agreed that he would be permitted to conduct *ex parte* meetings with witnesses . . ."); Brooks Motion at 2–3 ("[N]otwithstanding any agreement by the government to *ex parte* communications involving Mr. Kieffer, there has been no agreement regarding *ex parte* communications by, or on behalf of, Mr. Brooks, in his individual capacity."). It would seem, then, that movants believe that the justification for the special masters' au-

thority to engage in ex parte communications rests upon the consent of the parties to their appointment. This is incorrect. Although defendants' consent to their appointment does lend additional weight to their authority, that authority does not depend on the good graces of defendants. If it did, defendants would be able to revoke their appointment at will, which would be absurd. Rather, the special masters are authorized to engage in ex parte communications with third parties because their appointment orders provide them with such authority. Accordingly, it is irrelevant whether or not movants ever gave their consent, or presently give their consent, to the special masters to engage in ex parte communications.

**13.** *See, e.g.,* Babbitt Motion at 2 (acknowledging that ex parte communications by the Special Master "may have been helpful or even necessary to the conduct of the underlying litigation."); *cf.* Clark Motion at 3 ("Mr. Clark expresses no position here regarding the propriety of these [ex parte] procedures in the litigation on the merits.").

that might issue from those referrals.[14]

The Court notes, however, that movants' reliance on *Jenkins v. Sterlacci*, 849 F.2d 627 (D.C.Cir.1988), for the proposition that Special Master Balaran occupies a position commensurate with the Court, and therefore merits disqualification because of his unrecorded communications, is not well taken. In *Jenkins*, the D.C. Circuit was asked to decide "whether the district court properly denied appellant's motion to disqualify a special master who, while preparing a report in this case, represented a client in an unrelated proceeding in which a member of the law firm representing appellant served as opposing counsel." *Id.* at 628–29. After examining the issues of apparent impropriety, waiver, and bias, the court upheld the trial court's decision. Underlying the court's analysis, however, was its acknowledgment that, in the case before it, the special master "performed a role functionally indistinguishable from that of a judge." *Id.* at 634.

Movants' attempt to graft the holding in *Jenkins* onto the facts of the instant situation bears no fruit. Their argument that for the purposes of a disqualification motion, the Master should be held to the same standard as an Article III judge overlooks the fact that in *Jenkins*, the court's equating of masters with judges turned critically on whether the district court would be reviewing the master's findings only for "clear error." The D.C. Circuit explicitly stated that its decision to equate the two judicial officials was rooted in its determination that

> [t]he special master's factual findings on these issues were reviewed by the district court only for "clear error," as required by Rule 53(e)(2) of the Federal Rules of Civil Procedure. In the face of conflicting evidence, the 'clear error' standard insulates a special master's findings from reversal by the district court unless that court is left with the definite and firm conviction that a mistake has been committed.

*Jenkins*, 849 F.2d at 631 (citations and internal quotation marks omitted).

Indeed, by expressly distinguishing the First Circuit's holding in *Morgan v. Kerrigan*, 530 F.2d 401 (1st Cir.1976), that masters should not be held to the strict standards of impartiality that are applied to judges, the *Jenkins* court took pains to clarify that *"at least insofar as special masters perform duties functionally equivalent to those performed by a judge,* they must be held to the same standards as judges for purposes of disqualification." *Jenkins*, 849 F.2d at 631 n. 1 (emphasis added). And the litmus test by which special masters are construed to be the "functional equivalent" of judges is the

---

**14.** Rule 53(e)(2) of the Federal Rules of Civil Procedure provides that in non-jury actions, a master's factual findings become the judge's findings unless they are clearly erroneous. Additionally, when a special master makes findings of fact based on an evidentiary hearing convened pursuant to Rule 53(d), the judge may apply the "clearly erroneous" standard to such findings. *See Apex Fountain Sales, Inc. v. Kleinfeld*, 818 F.2d 1089, 1097 (3d Cir.1987) ("Under Rule 53(e)(2), a district court must accept a special master's proposed findings of fact unless clearly erroneous."). Under Rule 53(e)(1), the master must file a report with the clerk of the court setting out findings of fact and conclusions of law and must serve notice of the report on all parties. Unless instructed otherwise, the master must file with the report a transcript of the proceedings and of the evidence and the original exhibits, so that the court can review the evidence and decide whether the master's findings must be sustained as not clearly erroneous. *See Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, Charlotte Branch*, 80 F.3d 895, 905 (4th Cir.1996). Under Rule 53(e)(4), the weight afforded a master's findings is the same regardless of whether the parties have consented to his appointment.

"clearly erroneous" standard of deference. It is only on the basis of such deference that a functional comparison between the two positions is appropriate, requiring a strict proscription against off-the-record communications such as those enunciated in Canons 3A(4) and 3C(1)(a) of the Code of Judicial Conduct for United States Judges.[15]

Such concerns are of no moment here. Despite the fact that the Master's two reports that formed the basis for two of the September 17 Referrals were founded upon information subjected to formal process, and although the Master has implemented a set of procedures that prohibit ex parte communications in the underlying contempt investigation,[16] the Court, out of an abundance of caution, will not afford any findings made by the Master in this investigation the benefit of "clearly erroneous" deference. The tasks of the Master will be to investigate the issues raised in plaintiffs' bills of particulars; to take sworn, transcribed deposition testimony of material witnesses with counsel present; and to identify relevant documents produced in the litigation. The aim of all these tasks is to refine and explicate the issues involved for consideration by the Court. In his report to the Court, the Master will state whether or not there are sufficient grounds for plaintiffs' motions to show cause that would merit further proceedings by this Court in the form of oral or evidentiary hearings on the motions. Following the filing of the Master's report

with the Court will be a ten-day comment period during which objections and other recommendations may be made. And in accordance with the principles articulated in *Young v. Pierce* and *Lelsz v. Kavanagh*, cited above, in any objections to the report, movants may seek both factual and legal review *de novo*.

### 3. The Facts of the Instant Case Do Not Warrant Disqualification of the Special Master.

The Court notes, however, that even if Special Master Balaran had been directed to make findings of fact entitled to "clearly erroneous" review, and were therefore subject to ethical standards governing judges, the facts in this case do not warrant disqualification under the standards articulated in *Jenkins*. The court in *Jenkins* found that the appellant had failed to offer substantial evidence of extrajudicial conduct inconsistent with the master's responsibilities as an impartial decision-maker to support an allegation of actual bias. *Id.* at 634–35. The same is true here. The essence of movants' claim against the Master is that the Master engaged in secret communications with potential witnesses without counsel present; that these ex parte communications (admittedly proper at the time, and consented to by the parties) were the basis of his reports to the Court; that plaintiffs based their motions to show cause on the Master's reports; and that the Master is presently

---

**15.** Canon 3A(4) provides, in relevant part, that "[a] judge should ... except as authorized by law, neither initiate nor consider *ex parte* communications on the merits, or procedures affecting the merits, of a pending or impending proceeding." Canon 3C(1)(a) mandates that a judge recuse himself where his "impartiality might reasonably be questioned" because of "personal knowledge of disputed evidentiary facts concerning the proceedings."

**16.** *See* October 7, 2002 Memorandum from Special Master to Counsel, at 6 ("*All* communications with the Special Master shall be in writing and directed to the Law Offices of Alan L. Balaran, 1717 Pennsylvania Ave., N.W., Suite 1200, Washington, DC 20006. All correspondence shall be copied to counsel for the plaintiffs and the Named Individuals (both private and official.")).

directed to recommend whether or not the Court should grant plaintiffs' motions. Each of these individual points is mistaken. First, the Master has not been directed to decide plaintiffs' motions to show cause. Although he has been directed by this Court to report upon his investigation of issues raised by these motions, he is only being asked to report whether there are sufficient grounds to the allegations raised therein that would merit further oral or evidentiary hearings on the motions. Additionally, as noted above, the Master's findings will not be subject to "clearly erroneous" deference. Second, the two reports by the Master upon which two of the six September 17 Referrals were grounded were not based on ex parte communications. Instead, they were based on documents produced during discovery and on transcripts of sworn testimony taken with counsel present; moreover, the reports disclosed the sources of information on which they were based. Third, the reports and their accompanying documentation were not secret in any way, but were filed with the Court and provided to the parties for review and comment.

The Master issued two reports that ultimately formed the basis of two of the September 17 Referrals. One was the November 14, 2001 Report and Recommendation of the Special Master Regarding the Security of Trust Data at the Department of the Interior ("IT Security Report"), in which the Master exposed the flaws in the Interior Department's computer systems that undermined the security of individual Indian trust data. The second was the July 27, 2001 Opinion responding to Defendant Department of the Interior's Motion for a Protective Order Clarifying Duty to Produce · E–Mail Records ("E–Mail Report"). A review of these reports demonstrates that neither was based on ex parte or confidential communications.

Following the filing of the IT Security Report, defendants filed their Response to Plaintiffs' Renewed Motion for Temporary Restraining Order as Amended, arguing, *inter alia*, that the findings of the Master in the IT Security Report did not merit Rule 53 deference because they were founded upon improper one-sided communications. On December 12, 2001, the Master filed a Supplemental Report of the Special Master Regarding the Security of Trust Data at the Department of the Interior ("Supplemental Report"), outlining both the painstaking process that he undertook in arriving at his conclusions, and the manner in which government officials and contractors were interviewed and in which documents were compiled. The Supplemental Report demonstrated that the Special Master's findings were grounded in a formalized process that enabled all parties to participate in the review of all the relevant documents and all interviewed personnel. The Supplemental Report was never appealed. Moreover, as this Court has noted, defendants "conceded that '[t]he Supplemental Report and the provision of the documents which the Special Master consulted address, for purposes of the Special Master's Report, the Interior Defendants' arguments noted above.'" *Cobell v. Norton*, 205 F.R.D. 52, 55 (D.D.C.2002) (*citing* Interior's Response to Supplemental Report of the Special Master Regarding the Security of Trust Data at the Department of the Interior, dated December 31, 2001, at 2).

Similarly, a review of the E–Mail Report compels the conclusion that it too was organized without the benefit of any undisclosed communications. In that report, the Master was confronted with defendants' request for clarification of his May 11, 1999 order requiring them to search e-mail backup tapes for documents responsive to plaintiffs' Third Formal Request for Production of Documents. E–Mail Re-

port at 1–2. The Master's decision—again unopposed—was that Interior was obligated to backup, restore, search, and produce information contained on its e-mail tapes, and to retain those tapes in addition to any printouts of the communications therein. E–Mail Report, *passim*. In addition to the legal analysis, the Master found that notwithstanding existing requests for discovery and repeated court orders denying Interior's attempts to block backup tape retention, search and production, the Office of the Solicitor engaged in a pattern of overwriting (and thus destroying the data embedded in) e-mail backup tapes generated at: (1) the main headquarters in Washington, D.C. as well as in its 18 field and regional offices between June 1998 and November 1998; (2) 17 field and regional offices between November 1998 and May 1999; and (3) 11 field and regional offices between May 1999 and November 20, 2000.

E–Mail Report at 16.

It was this finding that prompted plaintiffs' March 20, 2002 Motion for Order to Show Cause. *See* March 20 Motion for Order to Show Cause at 4. Here too, however, the Master was painstakingly explicit about disclosing the sources that led to his conclusion. These sources included the November 20, 1998 Declaration of Glenn Schumaker, Management Information Systems Team Leader for the Office of the Solicitor; a December 5, 2000 letter from the Office of Solicitor Attorney Edith Blackwell to Department of Justice Associate Chief Charles Findlay; a memorandum generated by then-Deputy Solicitor Edward B. Cohen to Glenn Schumaker, Nancy Jemison, and Estle Lewis; and the April 12, April 19, June 22, and October 18, 2000 letters from Justice Department Assistant Chief Charles Findlay revealing the fact that backup tapes had been over-written. None of the information captured in the E–Mail Report even remotely suggests that it was gleaned from unmentioned sources—much less from ex parte communications.[17] In short, any honest reader of the Supplemental IT Security Report and the E–Mail Report would certainly not conclude that the information contained in these reports had been derived from confidential sources or from ex parte communications.

As for the reports of the Monitor that led to the filing of the remaining four September 17 Referral counts, these were matters referred solely to the Monitor for investigation, not to the Master. The Master and the Monitor have never conferred privately about any of the respective matters that the Court has referred to them. Additionally, there is no overlap between the subject matter of the Monitor's reports and the Master's reports that would give rise to any inference that any such communications took place.[18]

██ In sum, the Court assigned to Special Master Balaran the duty to investigate

---

17. At least with respect to these two September 17 Referral counts, there is no appearance of partiality concerning communications that at least three movants concede "may have been helpful or even necessary to the conduct of the underlying litigation." Babbitt Motion at 2. The three movants who filed the Babbitt Motion do not argue that the Master did anything but conduct his investigations as directed, submit reports to which the parties did not object, and publicly disclose the methodology he employed to gather information.

18. To the extent that movants suggest that the Monitor recuse himself from any of these contempt proceedings, this is a nonissue insofar as the Court has made no such referral nor anticipates that the Monitor will have any such dealings. Accordingly, the only basis for disqualification of the Monitor relates to his supposedly improper communications with this Court. This matter is fully resolved in the following section.

and report on whether the thirty-nine individuals violated the Court's orders. These powers, like other investigatory powers, are not "duties functionally equivalent to those performed by a judge." Accordingly, the *Jenkins* standard that compels the disqualification of judges as final adjudicators does not apply to special masters who are not undertaking judicial functions, *i.e.*, rendering determinative findings entitled to a "clearly erroneous" level of deference. And as stated above, to the extent that the Master has engaged in any ex parte communications, any findings based on such communications will not be subject to a "clearly erroneous" standard; instead, they will be considered by the Court together with other factors in deciding whether and how to proceed.[19]

## III. MOTION TO RECUSE

In addition to seeking disqualification of the Master, movants lodge an additional, more serious charge against this Court: that the Master and Monitor "conducted substantial, secret *ex parte* interviews of witnesses and other third parties about matters that lie at the heart of the contested factual issues raised by the pending motions and that they communicated [these] findings in repeated ex parte meetings with the Court." Babbitt Motion at 3–4. On the basis of this allegation, movants seek recusal of this Court under 28 U.S.C. § 455. As explained below, movants have completely misconstrued the nature of the contacts between the Master, the Monitor, and this Court. Because these contacts were neither improper nor unethical, they do not furnish grounds for recusal.

As explained above,[20] and as conceded by movants, it is perfectly appropriate for the Master and Monitor to conduct off-the-record interviews with government employees in the discharge of their obligations. But movants have mounted an additional charge: that the Master and Monitor tainted the Court by imparting

---

**19.** Neither of the two matters discussed in the recusal motion filed by David Shuey affect the Court's conclusion that the Master should not be disqualified. The Shuey Motion first asserts that a letter from the Master to Phillip Brooks dated January 31, 2001 relating to the destruction of documents at the Northern Cheyenne office of the Bureau of Indian Affairs mandates the Master's disqualification. Shuey Motion at 12–15. However, the letter has nothing to do with any of the issues underlying the September 17 Referrals. In the letter, the Master stated that during his interviews with employees of the Office of Trust Records, at least one employee had "described a palpable fear that s/he would be retaliated against for reporting management's failure to publish site-visit reports that described less [than] ideal conditions." Shuey Motion. Exh. 1. The Master also noted that he had learned that government counsel had "publicly call[ed] into question my ability to read, ... liken[ed] my investigation to those undertaken by television characters [and] insist[ed] that I have never practiced law." *Id.* Neither of these two points has anything to do

with the issue of whether any of the thirty-nine named individuals committed a fraud upon the Court meriting a finding of civil or criminal contempt. The Shuey Motion also claims that Mr. Shuey "has no way of ascertaining what was said by then Special Trustee Slonaker and Deputy Special Trustee Thompson to Special Master Balaran" during the sealed depositions conducted by the Master of these two individuals. Shuey Motion at 16. First, the Court notes that the subject of these depositions had nothing to do with the allegations against Mr. Shuey. Rather, the thrust of the Special Master's investigation centered around the conduct of the Trust Management Improvement Project (TMIP) steering committee, which had nothing to do with Mr. Shuey. Second, all that Mr. Shuey need do to obtain access to the deposition testimony is sign a protective order, which he is welcome to do. At least thirty-five attorneys and support staff, including movant Phillip Brooks, have already signed such an order.

**20.** *See supra* section II.C.1.

information related to the instant proceedings that they had gained through those interviews during their meetings with the Court. The problem with movants' assertion is that neither the Master nor the Monitor actually revealed to the Court any such information. Movants' conclusion that they did is based on unwarranted inferences drawn from two sources of information. First, movants point to the unremarkable fact that the time records of the Master and Monitor demonstrate that both officials have met on various occasions with this Court. Second, movants misconstrue selected passages of two opinions of this Court as purported admissions that the Monitor met with the Court for the purpose of sharing confidential information related to the instant proceedings gained during his off-the-record interviews. Both of these sources are examined below.

## A. The Consultations Between the Court and the Master

Movants note that the time records of the Master "reveal seven private meetings with the Court for a total of approximately eight hours." Babbitt Motion at 14. They assert that "the timing of the meetings was often very close to the times that the Court and the Special Master issued rulings in this case." *Id.* In support of this assertion, movants state that, prior to the

Court's issuance of an order on March 29, 2002 adopting one of the Master's reports, the Master met with the Court on January 14, January 15, and March 2. The Court is not convinced that even the latest of these meetings fell "very close" to the issuance of the Court's March 29 order. Additionally, there is no need to seek a sinister explanation for these meetings with the Court, given the fact that the Master was filing a status report with the Court in mid-January, and a monthly report at the beginning of March.

Of course, the simple fact that the Court has met with its special masters does not establish grounds for recusal. It is not only appropriate but necessary for the Court, as principal, to consult with its agents regarding the manner in which they are carrying out their assigned duties.[21] Moreover, the Rules Advisory Committee anticipated that such discussions would take place during the course of complex litigation matters. While acknowledging that a court might often decide not to conduct off-the-record discussions with its masters, the Committee concluded:

> Yet there may be circumstances in which the master's role is enhanced by the opportunity for ex parte communications. A master assigned to help coordi-

---

**21.** A recent publication presented at an American Law Institute seminar clarifies this distinction:

> It can be argued that masters can not carry out their duties effectively if they are completely prohibited from discussing scheduling, strategies and procedures with the judge outside of the presence of the parties. Yet, in light of ethical constraints judges may feel uncomfortable meeting with their masters without the parties present. The appropriateness of such communication can turn on the characterization of the master as a judicial agent or as an outside adjunct. If viewed as an agent of the court,

it is proper for the judge, as principal, to discuss with the agent the performance of his/her duties. If the master is viewed as an third party adjunct, it is improper for the judge as ultimate decision maker to receive undisclosed evidence and information from the master that could influence his or her decisions or which might reasonably be thought to do so.

Margaret G. Farrell, *The Role of Special Masters in Federal Litigation*, ALI–ABA Course of Study, Civil Practice and Litigation Techniques in Federal and State Courts, February 7–9, 2002, *available at* SG046 ALI–ABA 1005 (Westlaw).

nate multiple proceedings, for example, may benefit from off-the-record exchanges with the court about logistical matters. The rule does not directly regulate these matters. It requires only that the court address the topic in the order of appointment.

2001 Rules Committee Report at 143. In complex litigation such as the present action, it is imperative for the Court to hold off-the-record consultations with its special masters in order that they may keep the Court informed about logistical matters related to the case. The parties have always been aware that these discussions were taking place, and have never felt it necessary to object. Moreover, given the considerable duties that have been delegated to the Master and Monitor, it would be both naive and remiss for the Court to fail to consult regularly with these officials to ensure that they are faithfully administering their duties.

Of course, if the Master had conveyed information he had obtained in an investigatory capacity to the Court during these consultations, it would be a different situation. But the Master never did so. Instead, throughout these regular consultations, the Court discussed with the Master the general nature of the ongoing tasks that the Master was involved with, in order to ensure that the Master was responsibly carrying out the duties to which he was assigned.

Recognizing the need for such consultations between a court and its appointed officials, courts have refused to mandate recusal on the basis of such communications. For example, in *United States v. Yonkers Bd. of Education*, 946 F.2d 180 (2d Cir.1991), a housing segregation case, the district court appointed an outside housing advisor ("OHA") to provide it with expert advice and assistance regarding the implementation of the court's orders and to coordinate the activity of various parties, including government agencies. *Id.* at 181–82. The defendants moved for recusal under 28 U.S.C. §§ 455(a) and (b)(1), alleging that the judge and the OHA had engaged in improper communications "prior to and at the time of entry of certain indemnification orders," to which the City had not been privy. *Id.* at 182. The defendants also alleged that the OHA had improperly conveyed information regarding the facts of the case, which he had allegedly learned from off-the-record discussions with government counsel, to the judge. The Second Circuit affirmed the denial of the defendants' motion:

> Disqualification under section 455(b)(1) is not required in this case, since the contacts were made and the information was acquired by Judge Sand in his judicial capacity. While information acquired in a judicial capacity may lead to an appearance of partiality, here it did not because the communications did not relate to "disputed evidentiary facts," contrary to the contention of [the defendants].... [T]he government flatly denies the allegation that it used the OHA as a conduit for improper material. [Defendants have] submitted nothing controverting the government's denial. We conclude that *ex parte* contacts by the OHA are merely part of the performance of his prescribed duty and did not create an appearance of partiality on the part of the district court judge.

*Id.* at 184 (citing *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1314 (2d Cir.1988)).

Similarly, in *In re Big Rivers Electric Corp.*, 213 B.R. 962 (Bankr.W.D.Ky.1997), several parties moved to disqualify the bankruptcy judge and his appointed examiner under § 455 based solely on a series

of communications between the two.[22] The court denied the motions, explaining that

> [w]here, as in this case, the allegations of impropriety stem from ex parte communications occasioned by the exercise of judicial functions known to the parties and contemplated by unchallenged court orders, such contacts cannot be considered "extrajudicial."

*Id.* at 976. *See also United States v. Coven,* 662 F.2d 162, 168 (2d Cir.1981) ("Knowledge acquired by the judge while he performs judicial duties does not constitute grounds for disqualification."); *United States v. Haldeman,* 559 F.2d 31, 133 & 134 n. 301 (D.C.Cir.1976) (finding that a district judge's discussions about procedural matters with prosecutors "occurred as part of his official duties" and therefore did not mandate recusal).[23]

In short, the simple fact that the Court has consulted regularly with one of its judicial officials as part of its oversight function over matters in this case does not constitute a basis for recusal.

### B. The Consultations Between the Court and the Monitor

Several of the movants seek disqualification of the Monitor "from further proceedings involving these matters." Babbitt Motion at 1. However, it is a logical impossibility to "disqualify" an official from proceedings in which he is not a participant. As noted above, this Court has only directed the Master, not the Monitor, to issue a

report on the September 17 Referrals. Accordingly, there is no basis for demanding the "disqualification" of the Monitor in the instant proceedings because he has no involvement with them.

But movants also claim that because the Monitor has regularly met with the Court, it follows inescapably that the Court must have been receiving information about disputed facts in these proceedings that the Monitor had acquired in the course of his investigative capacity. Movants claim that this conclusion is "supported" by their interpretation of particular sentences found in two opinions of this Court from September of 2002. As demonstrated below, the conclusion that movants have reached rests upon a fundamental misunderstanding of the nature of the Court's consultations with the Monitor, and a fundamental misreading of the opinions of the Court.

### 1. The Time Records of the Monitor

The Monitor's time records show that he has consulted with this Court on a number of occasions during the course of this litigation. During these consultations, the Monitor informed the Court about his activities, in order that the Court could ensure that the Monitor was earning his keep. In the course of a typical meeting, for example, the Monitor might inform the Court that he planned to travel to New Mexico to meet with the Office of the Special Trustee, and receive a briefing about their role in the historical accounting

---

**22.** Examiners are judicial officials appointed by the court under 11 U.S.C. § 1104(c) to investigate allegations of fraud and misconduct by a debtor in bankruptcy. The court in *Big Rivers* noted that the order appointing the examiner authorized him "to have greatly expanded powers and duties in addition to those [typically] conveyed upon examiners," including the power to review all the debtor's files and records and to prepare a sealed report

concerning the validity of the allegations of fraud and misconduct. 213 B.R. at 966.

**23.** Additionally, the one state judicial ethics board that has addressed the question "May a judge engage in communications with a special master outside the presence of the parties or their attorneys without violating the prohibition against *ex parte* communications?" has answered in the affirmative: *see* Arizona Judicial Ethics Op. 95–14 (June 21, 1995).

process. Or he might explain that he traveled to Billings, Montana to meet with title records office personnel, examine their hard copy records, and review the pilot TAAMS system. Or he might inform the Court that he had been briefed by the Deputy Commissioner of the Bureau of Indian Affairs about the organization of their office. The Monitor mentioned the offices that he had enquired into, and let the Court know whether he was obtaining regular access to higher-level government officials, as he was supposed to. The consultations typically concluded with the Court informing the Monitor which task he should perform next, or with the Monitor suggesting that he should draft a report about the activities he had just concluded.

■ In short, the subject of these consultations was what the Monitor was doing, not what he was finding. Although the Monitor did tell the Court about the general nature of his activities, the Monitor did not disclose any of the bare facts that he might have uncovered during his investigations. These consultations were a necessary component of the Court's oversight function over its special masters. It is not beyond the realm of possibility that in the course of one of these consultations, the Monitor might have incorporated into his discussion some piece of information that would arguably constitute a "fact" rather than a general description of his activities. But the Court can declare unequivocally that it knows of no such information that was provided during any of these consultations. Given that, to the Court's knowledge, the Monitor never disclosed to the Court any of the naked facts that the Monitor had uncovered in the course of his investigations, his consultations with the Court furnish no basis for recusal.

As a recent case from this Circuit makes clear, the simple fact that the Court re-

ceived logistical information about the Monitor's ongoing activities does not mandate recusal. In *Clifford v. United States*, 136 F.3d 144 (D.C.Cir.1998), during the course of a criminal forfeiture proceeding, the district court appointed a trustee to liquidate the defendant bank's assets. *Id.* at 146. Two former bank officers, who were parties in several related civil cases, requested notes from an in camera discussion between the judge, the trustee, government counsel, and counsel for the bank's fiduciaries, as well as a sealed report that had been filed by the trustee. *Id.* at 147. The officers' justification for their request was their contention that the discussion and the report related to their civil suits. *Id.* The district court denied the request, explaining that the materials were not directly related to the ongoing civil cases, and the officers appealed. *Id.* at 148. The D.C. Circuit, noting that the district judge had "found that the contents of these communications did not concern the merits of appellants' pending civil actions," affirmed, "defer[ring] to the trial court's factual determination." *Id.* at 150. The court also rejected the claim that the district judge's communications with a court-appointed official constituted a per se violation of the officials' due process rights. It explained that because, "[a]s a matter of court management and efficiency, the assignment of related matters to a single judge is preferred .... [t]rial judges frequently receive extraneous information about parties appearing before them but are presumed to disregard it." *Id.* at 148. The court noted that "[j]udges are presumed to be able to compartmentalize the information they receive and only rely on evidence relevant for a particular decision," and discussed the reasoning supporting this presumption:

> [W]hen a party conveys ex parte information to a judge that relates to a pending case, courts presume that the trial

judge, who is in the best position to evaluate the information, can adequately determine whether such communications go to the merits of the case and promptly stifle them or require disclosure when necessary. Without such a presumption, the process for handling litigation would become inordinately complex, occasioning additional delays and encumbering burdened trial judges with piecemeal responsibilities incompatible with the necessities of efficient trial management.

*Id.* at 149, 150 (citations omitted). In the instant case, the Court has determined that the Monitor has not conveyed any factual information gained in the course of his investigative role during any of his consultations with the Court. Accordingly, it is beside the point whether the discussions with the Monitor may or may not have incidentally referred to the parties in the instant proceedings. The Court will disregard any such information in its rulings, and will make its findings of fact and conclusions of law based solely on the evidence found in the record of this case.

### 2. The Opinions Quoted by Movants

Movants point to individual passages from two opinions of this Court that they claim constitute tacit admissions that it received information from the Monitor regarding the instant proceedings that the Monitor had obtained from confidential interviews. Any honest reading of these opinions, however, demonstrates that movants have fundamentally misconstrued these passages.

### a. September 17, 2002 Memorandum and Order

In order to present in their proper context the parts of the Court's September 17, 2002 Memorandum and Order that movants have selectively quoted, it will be necessary to relate at some length the events that led up to that opinion. The Monitor met with Secretary Norton on April 24, 2001 to discuss his monitoring duties with her, as well as the authority that had been conveyed by his appointment order. Mem. and Order dated September 17, 2002 (Denying Mot. to Revoke Court Monitor) at 3 ("September 17 Order"). On November 1, 2001, Deputy Interior Secretary J. Steven Griles approached the Monitor. *Id.* at 4. The Deputy Secretary explained that Secretary Norton had requested that the Monitor commence a series of meetings with the Deputy Secretary and his senior subordinates. *Id.* He further explained that the meetings would have a dual purpose: to allow the Deputy Secretary to "address the concerns of the Court Monitor and resolve them to further trust reform without the need to involve the parties in additional litigation" and to "alleviate the need for the Court Monitor to submit further Reports to the Court unless the Deputy Secretary could not or would not correct the issues giving rise to those concerns." *Id.* The Monitor responded that because the proposed meetings would be with senior Interior Department officials, and would take place without the participation of plaintiffs or their counsel, he would need to discuss the matter with the Court. On that same day, after the Monitor had informed the Court of the Deputy Secretary's proposal, and explained the purpose and intent of the proposed meetings, the Court authorized the Monitor's attendance at this series of meetings. *Id.* Thereafter, the Monitor met regularly with the Deputy Secretary, with Associate Deputy Secretary James Cason, and with Director of Indian Trust Transition Ross Swimmer for over six

months. *Id.* at 4–5.[24]

As discussed above, it is the Court's practice to consult regularly with its masters as part and parcel of its oversight function over its judicial officials. Accordingly, from November of 2001 until April of 2002, the Monitor kept the Court informed of the general nature of these meetings. The Monitor did not relate the details of his various conversations with the Interior officials; rather, he informed the Court that the meetings were still going on, and related the general topics of discussion (e.g., that the officials had discussed the Bureau of Indian Trust Asset Management, or had discussed the Office of the Special Trustee). The Monitor also informed the Court that Griles, Swimmer, and Cason were continually imploring the Monitor to keep the Court informed that these meetings were still going on because they sought to persuade the Court that the Interior Department was making every effort to comply with its fiduciary responsibilities.

In April of 2002, the Monitor informed the Deputy Secretary that a dispute was developing between Secretary Norton and Special Trustee Thomas Slonaker regarding the appropriate role of the Special Trustee. *Id.* at 10. The Deputy Secretary asked the Monitor if he would attend a meeting between the Deputy Secretary and the Special Trustee in an attempt to resolve the dispute. *Id.* The Monitor responded that he could do so only if the Court expressly authorized his attendance at the meeting and provided its approval for the role that the Monitor was being asked to undertake during the meeting. *Id.* at 10–11. Accordingly, the Monitor

met with the Court on April 18 to discuss the Deputy Secretary's request, and the Monitor presented the background facts surrounding the request. *Id.* at 11. Based on the representations of the Monitor, the Court authorized his participation in the meeting, which took place the following day. *Id.* As the Monitor later stated in his Seventh Report, during the meeting, the Interior Department refused to acknowledge that the Special Trustee's role included overseeing and reporting to Congress, and advising Secretary Norton on the problems with the Department's trust reform activities. *Id.* Even though the meeting had proven unsuccessful, however, the Monitor continued to meet with the Deputy Secretary. *Id.* at 13.

On June 14, 2002, defendants moved to revoke the Monitor's appointment, claiming that he was "unfit to perform the significant responsibilities assigned to the Court Monitor in this case and that the Court must therefore revoke his appointment." Interior Defs.' Mem. in Support of Mot. to Revoke the Appointment of Joseph S. Kieffer, III, and to Clarify the Role and Authority of a Court Monitor, at 17 ("the Revocation Motion").[25] Included with defendants' motion were declarations from the three officials that the Monitor had met with between November 2001 and April 2002, namely, Deputy Secretary Griles, Associate Deputy Secretary Cason, and Director of Indian Trust Transition Swimmer. *See* Attachments E, F, and G to the Revocation Motion. These declarations discussed in detail the substance of the conversations that took place during the April 19 meeting with the Special

---

**24.** It should be noted that these three men are not among the thirty-nine individuals who are the subject of the September 17 Referrals.

**25.** It is interesting to note that defendants brought their motion to disqualify under 28

U.S.C. § 455(a) and (b)(1), the very same statutes under which movants have brought their present motions to disqualify the Special Master, to disqualify the Special Master–Monitor, and to recuse the Court.

Trustee, and included direct quotations that were attributed to the Monitor. The Court subsequently denied defendants' motion in a memorandum and order dated September 17, 2002.

It is this memorandum and order that movants cite in support of their conclusion that the Monitor provided the Court with information related to these proceedings that the Monitor had obtained in the course of his investigative capacity, mandating the recusal of the Court. But all that this opinion demonstrates is the simple fact that the Monitor obtained the Court's authorization for a six-month series of meetings with Interior Department officials, and then kept the Court apprized of the fact that those meetings were taking place. Thus, for example, the Court noted that

[t]he Court Monitor met with Mr. Griles on at least *twenty* occasions for approximately thirty hours. While it is not the Court's intention to compound the violation of the confidential ex parte nature of these discussions (as was done by the Deputy Secretary and his subordinates when they filed their declarations), suffice it to say that those discussions, reported to this Court by the Court Monitor, ranged far and wide on the trust reform efforts of Mr. Griles, as the Secretary's appointed "man in charge" of trust reform. As with Mr. Rossetti, the Court Monitor, at the request of the Deputy Secretary, described the reviews he conducted of the progress of trust reform and the historical accounting and answered all questions posed by the Deputy Secretary and his key subordinates about their plans and operations regarding these matters. While not specifically identifying the subject matter of those discussions here, the Court was aware that they involved matters that later became the subject of the Court Monitor's Fifth (the historical ac-

counting), Sixth (the Eighth Quarterly Report), and Seventh (the Special Trustee) Reports to the Court. Also during this same period, the Secretary's proposed Bureau of Indian Trust Asset Management (BITAM) was under formation and review at Interior and was and is also a subject of the Court Monitor's continuing review.

*Id.* at 5–6 (emphasis in original). Movants have apparently misread the second and fourth sentences of this paragraph as tacit admissions of improper behavior on the part of the Monitor and this Court. But the only thing that this paragraph relates is the fact that during his meetings with the Court, the Monitor reported that his conversations with Deputy Secretary Griles related to the Deputy Secretary's efforts at trust reform, and let the Court know that the reports he was planning to file would touch upon what was discussed during these meetings. In short, the Monitor, as was his practice, consulted with the Court, and informed it of the activities in which he was currently engaged.

The memorandum and order also noted that the declarations of Griles, Cason, and Swimmer "utterly fail[ed] to report accurately the facts surrounding the reason the Deputy Secretary requested the Court Monitor's attendance at [the April 19] meeting, the circumstances under which he was authorized by this Court to participate in the meeting, and the reasons for the continuing dialogue about the Special Trustee that was held with the Deputy Secretary before, during, and after this meeting." *Id.* at 9. Accordingly, the Court attempted to clarify the circumstances surrounding this meeting:

This Court has given serious consideration to hearing testimony on the instant motion to include that of the Court Monitor and the former Special Trustee to

fully document the six month history of meetings between the Court Monitor and the Deputy Secretary, always at the latter's request, and the uses to which the Deputy Secretary may have improperly attempted to bend the good will efforts of the Court Monitor to defendants' own benefit. However, the Court is personally aware of the background of the April 19, 2002 meeting, the conversations at that meeting and at the subsequent meetings between the Deputy Secretary and the Court Monitor. Contemporaneous reports by the Court Monitor to the Court and the public record are sufficient to avoid the necessity of lifting the ex parte veil from these meetings any further than it has been torn by the words of the Deputy Secretary in his declaration and those of his subordinates in theirs.

There is a simple truth regarding the Court Monitor's participation in and presentation at this meeting. In several meetings prior to the April 19, 2002 meeting, the Court Monitor apprised the Deputy Secretary that there was a dispute developing between the Secretary and the Special Trustee (with a central role being played by the Deputy Secretary in threatening to fire the Special Trustee) regarding the appropriate role of the Special Trustee. The Court Monitor had also alerted the Deputy Secretary that he had planned, before learning of this dispute, to submit a Report of his review of the Special Trustee's role in the trust reorganization underway within the Interior Department. That review would have to include this dispute if it were not resolved. The Deputy Secretary was the person that requested the Court Monitor meet with both the Special Trustee and him to discuss the issue.

The Court is aware of the substance of these meetings concerning the Special Trustee and of the meeting held by the Deputy Secretary with the Court Monitor the day before the April 19, 2002 meeting. The Court Monitor had agreed to attend the latter meeting at the request of the Deputy Secretary *only* if this Court authorized that attendance and approved the role the Deputy Secretary asked the Court Monitor to undertake during the April 18, 2002 meeting. Based on a review with the Court Monitor of the presentation of the facts surrounding the request of the Deputy Secretary at the prior meeting, his pledge to honor the previous ex parte agreement with the Court Monitor, and that he would provide notice to and receive agreement from defendants' counsel that the meeting could take place in the manner requested, without the attendance of counsel, this Court authorized the Court Monitor to honor the Deputy Secretary's request and attend and participate in the meeting.

*Id.* at 9–11 (emphasis in original). As already explained, the only reason that the Court knew anything about the April 19 meeting, or the background relating to that meeting, is that the Monitor was compelled to "present[ ] the facts surrounding the request of the Deputy Secretary" to hold the meeting, in order that the Court could make an informed decision about whether to authorize the Monitor's attendance at the meeting. Movants have apparently inferred from the Court's description of this single incident that the Monitor's standard practice is to convey to the Court the substance of his conversations with third parties, including his ex parte discussions with lower-level government employees. But this inference is wholly unwarranted. As explained above, it was only the extraordinary nature of the Deputy Secretary's request that the Monitor serve as a mediator between the Deputy Secre-

tary and the Special Trustee that compelled the Monitor to provide the Court with the factual background surrounding the April 19 meeting. Indeed, if the Monitor had regularly provided the Court with a detailed account of his conversations with the Deputy Secretary and his subordinates, it would certainly be unnecessary for the Court to consider "hearing testimony on the [Revocation Motion] to include that of the Court Monitor and the former Special Trustee to fully document the six month history of meetings between the Court Monitor and the Deputy Secretary ... and the uses to which the Deputy Secretary may have improperly attempted to bend the good will efforts of the Court Monitor to defendants' own benefit." After all, what would be the need to hear any such testimony, if the Court was purportedly receiving a detailed play-by-play on the entire series of meetings from the Monitor as they occurred?

In short, the conclusions that movants have made, based on the September 17 memorandum and order, are derived from unwarranted inferences based upon a fundamental misunderstanding of the language contained in this opinion.

**b. September 30, 2002 Memorandum and Order**

Movants also isolate a single sentence from a memorandum and order dated September 30, 2002 addressing objections by defendants regarding the reasonableness and propriety of the Monitor's compensation requests. Defendants had alleged that the requests did not provide sufficient details about the work that the Monitor had performed. In response, the Court first noted that unlike the situation in which a prevailing party submits a proposed fee bill to a court, which warrants scrutiny of the hours billed by the opposing party, in the instant case, "both the Court Monitor's activities and his compensation requests are subject to monthly review by this Court." Mem. and Order dated September 30, 2002 at 4. In response to defendants' specific concern that the Monitor's compensation requests did not reveal the identities of every person with whom he met, the Court reminded defendants of the necessity that the Monitor not disclose publicly the names of these persons:

> This Court drafted the ex parte language in the orders appointing the Court Monitor and extending his appointment for the express purpose of preventing any renewed retaliatory action in conjunction with his monitoring activities. The Court Monitor was required to remain independent of any control by defendants or their surrogates so as not to impair his ability to conduct his investigation.

*Id.* at 5. Accordingly, the Court explained, it had

> authorized the Court Monitor to hold in confidence the identity of such entities, as well as the substance of any statements made by their employees to him. It would be manifestly improper for the Court Monitor's compensation requests to violate such confidences by naming the persons with whom he has met or describing the nature of their conversations. It is sufficient that the Court Monitor has advised this Court regarding his meetings and discussions with third parties and has always informed this Court about the nature, extent, and substance of such meetings and discussions upon request. To provide defendants access to information about the Court Monitor's discussions regarding defendants' trust reform activities, including the names of persons with whom he conducts such discussions, would allow defendants to influence or control the information that the Court Monitor

receives. Defendants understood this problem when they consented to the Orders appointing the Court Monitor and the extension of that appointment. *Id.* at 4.

Movants have misconstrued the sentence "It is sufficient that the Court Monitor has advised this Court regarding his meetings and discussions with third parties and has always informed this Court about the nature, extent, and substance of such meetings and discussions upon request" as a supposed admission that the Court and the Monitor have engaged in substantive discussions of the facts discovered by the Monitor in the course of his investigative duties. The remainder of the opinion belies this misinterpretation of this sentence. This sentence relates the simple fact that the Court has conferred with the Special Master–Monitor in order to keep abreast of his activities, and to ascertain that he is abiding by the mandate provided in his order of appointment. Additionally, when the Court has made a request that he do so, the Monitor has told the Court what the subject matter of his discussions with third parties was: for example, that the Monitor had been briefed about the organization of the office of the Bureau of Indian Affairs. Perhaps the Court might have stated, more accurately, that "the Monitor has always informed this Court about the nature and essence of such meetings and discussions, whenever the Court has requested it." But the Court did not anticipate that movants would be extracting isolated sentences from its opinions and marshaling them forth as purported "evidence" of the unwarranted conclusions that movants have set out in their various motions.

## C. The Legal Standards for Recusal

### 1. 28 U.S.C. § 455(b)(1)

■ 28 U.S.C. § 455(b)(1) provides, in relevant part, that a judge shall "disqualify himself ... (1)[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." Section 455(b)(1) requires a moving party to demonstrate actual bias or prejudice based upon an extrajudicial source. *Tripp v. Executive Office of the President,* 104 F.Supp.2d 30, 34 (D.D.C.2000). As explained above, the Court has not received extrajudicial knowledge of disputed facts in this litigation. Accordingly, there is no basis for its recusal under Section 455(b)(1).

The two opinions that movants invoke in support of recusal under this section are inapposite because they involve situations in which the court engaged in ex parte communications with court-appointed expert witnesses relating to the merits of the underlying litigation. In *Edgar v. K.L.,* 93 F.3d 256 (7th Cir.1996), the Seventh Circuit Court of Appeals disqualified a district judge from a case in which he repeatedly met outside the presence of counsel to discuss the merits of the case with an appointed panel of expert witnesses scheduled to testify at trial. *Id.* at 257–58. Because the district judge "declined to state on the record his own memories of what happened," and instead chose to invoke an unspecified "judicial privilege," the Seventh Circuit was forced to assume that the conversations involved a discussion of the merits of the litigation. *Id.* at 258. Accordingly, because the judge had effectively appointed agents to conduct investigations of disputed facts in the litigation, and then disclose the naked evidence they had learned in private sessions with him, the Seventh Circuit disqualified the judge, explaining that his discussions with the experts were "calculated, material, and wholly unnecessary." *Id.* at 259. By contrast, in the instant case, the Court has

explained that the consultations with its special masters did not include discussions of facts that the masters had learned in their investigative capacities. Moreover, the Court has described the nature of those consultations as best as it can without compromising the confidence that the masters have placed in the Court. In contrast to the "wholly unnecessary" meetings conducted by the *Edgar* judge, this Court's regular consultations with the special masters were essential to ensure that these officials were faithfully carrying out the duties assigned to them under their appointment orders.

The only other case cited by movants, *United States v. Craven,* 239 F.3d 91 (1st Cir.2001), is also inapposite. In that case, the district judge had based a downward sentencing departure solely on a one-hour ex parte conversation about the merits of the case with a court-appointed psychologist. *Id.* at 95–96. The First Circuit declared that "a sentencing court may not utilize an ex parte conversation with a court-appointed expert as a means to acquire information critical to a sentencing determination and then rely on that information in fashioning the defendant's sentence." *Id.* at 101. Because the appellate court "believe[d] that it would be surpassingly difficult for [the judge] to disregard the guidance that she previously received from Dr. Weisman" in passing sentence, it remanded the case to a different judge. *Id.* at 103. In the instant case, however, the Court has received no such improper "guidance" from either of its special masters on the merits of the instant proceedings. And unlike the *Craven* judge, the Court has made no ruling—and it will not make any future ruling—based on its off-the-record consultations with the special masters. Indeed, there would be no way for the Court to make a ruling based on these discussions, because they involve matters of logistics, not the merits of the

underlying litigation. Accordingly, the only substantive decisions by the Court that have depended upon the findings of the Master or the Monitor are those which rely upon their written reports to the Court. These reports are provided to the parties, and any findings of fact and legal conclusions contained in them are subject to objections by either party.

■ In short, because the Court possesses no "personal knowledge of disputed evidentiary facts concerning the proceeding," there is no basis for its recusal under 28 U.S.C. § 455(b)(1).

### 2. 28 U.S.C. § 455(a)

■ 28 U.S.C. § 455(a) provides that a federal judge shall "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Whether there is any basis for questioning a judge's impartiality under § 455(a) is to be determined by an objective standard. *United States v. Microsoft,* 253 F.3d 34, 114 (D.C.Cir.2001) ("The question is whether a reasonable and informed observer would question the judge's impartiality."); *In re Barry,* 946 F.2d 913, 914 (D.C.Cir.1991). This standard "assumes that a reasonable person knows and understands all the relevant facts." *In re Drexel Burnham Lambert Inc.,* 861 F.2d 1307, 1313 (2nd Cir.1988), *cert. denied,* 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989) (emphasis omitted).

■ This Court finds that no reasonable observer, with knowledge of all the relevant facts, would conclude that the impartiality of the judge in this case was to be questioned. Movants' basis for recusal under this section is founded upon its allegation that the consultations between the Court and its two special masters "would cause any reasonable person to have reason to question the Court's impartiality."

Most Motion at 4. But as explained above, neither the Master nor the Monitor has conveyed to the Court any of the bare factual information that they might have learned in the course of their investigative duties. Accordingly, it is difficult to fathom why any *objective* observer might harbor any doubts about the Court's impartiality in this case.

## IV. MOTION TO TAKE FULL DISCOVERY OF THE SPECIAL MASTERS

In the event that their motions for recusal and disqualification are not well taken, movants seek, in the alternative, to "take full discovery" of the Master and Monitor relating to their off-the-record consultations with the Court. Brooks Motion at 2. The Court concludes that the extreme step of authorizing discovery of judicial officers is unwarranted in the present situation.

 "Oral examination of a judicial or quasi-judicial officer as to matters within the scope of his adjudicative duties should be permitted only upon a strong showing of bad faith or improper behavior." *United States v. Ianniello*, 740 F.Supp. 171, 187 (S.D.N.Y.1990), *rev'd on other grounds sub nom. United States v. Salerno*, 937 F.2d 797 (2d Cir.1991). The First Circuit has held that while a party may seek discovery relating to a recusal motion, "the allowance of such discovery is within the sound discretion of the court." *In re Martinez–Catala*, 129 F.3d 213, 220 (1st Cir.1997).

In *United States v. Pollard*, 747 F.Supp. 797 (D.D.C.1990), the defendant moved for recusal of the district judge under 28 U.S.C. § 455(a) and (b)(1), based on an affidavit purporting to describe a conversation between the judge and a deceased Supreme Court Justice. *Id.* at 799. According to the affidavit, the Justice had told the affiant of a conversation with the district judge, in which the judge related that when he sentenced the defendant, he had relied on materials submitted ex parte by the government. *Id.* The defendant claimed that because he could "only pursue this inquiry through an evidentiary hearing," and because the only available witness who could testify about the matter was the district judge, it would be necessary for the judge to recuse himself. *Id.* Explaining that the allegation was false, the district judge denied the defendant's recusal motion. *Id.* at 801 & n. 4. The D.C. Circuit affirmed, noting that

> [t]he district judge in this case was, of course, intimately familiar with the record and knew as a matter of fact whether or not the government had submitted *ex parte* material to him. The Chief Judge attested that it had not. He accordingly denied the motion for a hearing. We believe the Chief Judge was well within his discretion to do so.

*United States v. Pollard*, 959 F.2d 1011, 1031 (D.C.Cir.1992). The court noted that the defendant's motion for a hearing "may have been designed primarily to force the judge to recuse himself." *Id.* at 1031 n. 13. This Court has similar suspicions about movants' demands to depose the Master and Monitor, given that a court which decides to permit one of its judicial officials to be deposed creates a serious risk that its decision will mandate its own recusal. *See, e.g., Kennedy v. Great Atlantic & Pacific Tea Co.*, 551 F.2d 593, 598–99 (5th Cir.1977) (finding that the decision of a district judge to permit his law clerk to testify at trial constituted reversible error); *Terrazas v. Slagle*, 142 F.R.D. 136, 139 (W.D.Tex.1992) (refusing to permit defendants to depose the presiding judge's law clerks because "the mere taking of the depositions of the law clerks will have the legal effect of disqualifying the employing judges"); *United States v. Ferguson*, 550 F.Supp. 1256 (S.D.N.Y.1982) (granting motion to recuse district judge because his

former law clerk had testified before the grand jury). Therefore, for this Court to set a precedent by authorizing the deposition of the special masters would allow parties to any complex litigation requiring the use of special masters to achieve indirectly what they would be unable to achieve directly—namely, the recusal of the presiding judge. This the Court refuses to do.

The case law from other circuits on this issue also weighs heavily against movants. In *Yonkers,* discussed above, the Second Circuit affirmed the district judge's denial of a motion to compel discovery of its court-appointed outside housing advisor regarding communications between the advisor and the judge. The court explained that "[d]iscovery of the substance of challenged communications between Judge Sand and the OHA is not appropriate, as a degree of confidentiality in the relationship between the court and its housing advisor is justifiable in light of attempts to block implementation of [the consent decree] by the City and other groups." *Yonkers,* 946 F.2d at 185.

In *Cheeves v. Southern Clays, Inc.,* 797 F.Supp. 1570, 1572 (M.D.Ga.1992), plaintiffs served three federal district judges with notices to take depositions and subpoenas duces tecum in connection with a motion to disqualify the presiding judge. The disqualification motion was based upon alleged communications between the presiding judge and the other two judges. *Id.* at 1574–75. A fourth judge granted the three judges' motions to quash the notices of deposition and subpoenas. The court commenced its opinion by asserting that

[b]roadly stated, the issue to be determined is whether, and under what circumstances, if any, a judicial officer may be compelled to personally submit to discovery inquiries in aid of a motion to disqualify one of such officers from proceeding further in a case over which he or she is presiding.

*Id.* at 1573. Though it acknowledged that discovery might be warranted in an "appropriate case," the court refused to permit plaintiffs to take discovery from the three judges.[26] It held that "compulsory discovery process addressed to the presiding judge in aid of a motion to disqualify that judge pursuant to 28 U.S.C. §§ 144 and 455(a) is not available to a litigant upon initial presentation of the motion or the request for such discovery in the district court." *Id.* at 1583. With respect to the two non-presiding judges, the court determined that

[w]hile there is no rigid impediment to the taking of their depositions as there is in the case of Chief Judge Owens as the presiding judge, I have nonetheless determined that neither should be subject to compulsory discovery process in the circumstances of this case. On the basis of the showing made in support of the asserted need for such discovery, the only line of inquiry to be addressed to either would relate to judicial communications between or among the three judges, and that information is simply not relevant, i.e., it does not relate to extra judicial bias.

*Id.* at 1584.

Even if the Court were to agree that discovery of judicial officers might be

---

**26.** The opinion defined "appropriate case" as "a case in which the party seeking discovery is able to demonstrate in good faith, pursuant to Rule 26, a substantial basis for believing that the discovery being sought 'appears reasonably calculated to lead to the discovery of admissible evidence' in support of a pending or contemplated motion for disqualification, and that such information is not 'obtainable from some other source that is more convenient.' " *Id.* at 1580 n. 17.

warranted in an appropriate case, the present case is manifestly not one of them. The sole line of inquiry that movants seek to pursue relates to communications which, as explained above, neither conveyed information about disputed facts in these proceedings nor imparted an extrajudicial bias to the presiding judge. Movants have not cited any case or statute in support of their request, and this Court knows of no case in which a court has authorized discovery to be taken upon judicial officers. On the other hand, courts that have considered the issue have refused to permit discovery to be taken upon special masters. *See, e.g., Gary W. v. State of Louisiana Dep't of Health & Human Resources,* 861 F.2d 1366 (5th Cir.1988) (affirming decision to quash subpoena and notice of deposition upon special master); *McCoy v. Belmont,* 1999 WL 33117446 (D.Conn. 1999) (refusing to permit discovery upon special master). Moreover, the Master and Monitor consented to their appointments in this case based on the understanding that their consultations with the Court about logistical matters would remain confidential, in order that neither party could make use of these discussions to attack the other party. The Court will not betray the confidence that these officials have reposed in it by permitting movants to interrogate them about their consultations with the Court. Accordingly, the Court declines to take the extraordinary step of compelling the deposition of the two special masters in this case.

## V. CONCLUSION

■ This Court takes seriously any issue that might prompt its recusal or the disqualification of its special masters. But movants have failed to demonstrate that recusal of the Court is required under either 28 U.S.C. §§ 455(a) or (b)(1). It is, admittedly, a tempting prospect for the Court to contemplate recusing itself, given

the hundreds of judicial hours that this case has consumed, and the innumerable antagonisms it has fostered. In many ways, it would be a welcome relief for the Court to slough off the burdens of this seven-year litigation onto some other judge, unmindful of the headaches it has provoked. But the Court would be abdicating its judicial responsibilities, were it to do so. A district judge is under just as much of an obligation not to recuse himself unnecessarily as he is obliged to recuse himself when it does prove necessary. *In re Certain Underwriter,* 294 F.3d 297, 302 (2d Cir.2002). Therefore, the Court, mindful of its obligations under the law, will not recuse itself from these proceedings.

Movants have also failed to demonstrate the necessity for disqualification of the two special masters or of taking discovery from the special masters. Accordingly, it is hereby

ORDERED that Anne Shields' Motion for Recusal, or in the Alternative, to Take Discovery Relating to Ex Parte Communications [1581–1, 1581–2]; Philip A. Brooks' Motion for Recusal, or in the Alternative, to Take Discovery Relating to Ex Parte Communications [1582–1, 1582–2]; Motion for Recusal (Bruce Babbitt, John Leshy, Edward Cohen, and Edith Blackwell) [1583–1]; Charles W. Findlay's Motion for Recusal, or in the Alternative, to Take Discovery Relating to Ex Parte Communications [1645–1]; Michael Rossetti's Motion for Recusal or, in the Alternative, to Take Discovery Regarding Ex Parte Communications [1595–1]; John S. Most's Motion for Recusal of Royce C. Lamberth or in the Alternative, to Take Discovery Relating to Ex Parte Communications [1601–1]; Motion for Recusal, or in the Alternative, to Take Discovery Related to Ex Parte Communications (Michael Carr) [1646–1]; Tom Clark II's Motion for Limited Recusal [1665–1]; David

**103**

Shuey's Motion for Recusal, or in the Alternative, For Leave to Take Discovery to Ex Parte Communications [1672–1]; Motion of Sarah Himmelhoch for Recusal, or, in the Alternative, for Discovery Relating to Ex Parte Communications [1675–1]; Motion of Kenneth F. Rossman for Recusal, or, in the Alternative, for Discovery Relating to Ex Parte Communications [1679–1]; Motion for Recusal and Disqualification or, in the Alternative, to Take Discovery Regarding Ex Parte Communications (Sabrina McCarthy) [1683–1]; and Steven Swanson's Motion for Recusal and Disqualification or, in the Alternative, to Take Discovery Regarding Ex Parte Communications [1689–1] be, and hereby are, DENIED.

SO ORDERED.